UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES DIMRY,<br><br>    Plaintiff,<br><br>    v.<br><br>BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN, et al.,<br><br>    Defendants. | Case No. 19-cv-05360-JSC<br><br>**ORDER RE: CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**<br><br>Re: Dkt. Nos. 33, 36 |

Plaintiff is a former player in the National Football League. He challenges the decision of the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Plan") to deny him total and permanent disability benefits under the Plan and the Employee Retirement Income Security Act of 1974 ("ERISA"). Both parties now seek judgment in their favor under Federal Rule of Civil Procedure 52.[1] (Dkt. Nos. 33 & 36.) Having considered the parties' briefs and the relevant legal authority, and having had the benefit of oral argument on July 30, 2020, the Court finds that Defendants abused their discretion in denying Mr. Dimry's disability claim and REMANDS for further proceedings consistent with this Order.

**BACKGROUND**

Mr. Dimry was drafted by the Atlanta Falcons in 1988. (Supplemental Administrative Record ("SAR") at 233, Dkt. No. 34-2 at 7.[2]) Throughout his 12-year career with the NFL he sustained a number of injuries including concussions, and other head and neck injuries. (SAR at 316.) In 2000, he retired from the San Diego Chargers and shortly thereafter underwent an

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 13 & 15.)
[2] The SAR spans ECF Docket No. 34-1 and No. 34-2. ECF Docket No 34-1 contains SAR 1-227 and ECF Docket No. 34-2 contains SAR 228-414.

anterior cervical fusion at C5-C6. (SAR 154, 156, 316.) In 2011, he had a second cervical fusion surgery at C5-6 and C6-7. (SAR 21.)

In 2014, Mr. Dimry applied for Total and Permanent (T&P) Disability benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan. The Plan states that an individual qualifies for T&P benefits if he is "substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit." (SAR 87 (citing Plan Section 5.2(a).) Mr. Dimry claimed he was disabled based on (1) cervical spine degenerative disc disease, stenosis, osteophytes at C3-4, C4-5, twice failed fusion at C5-6, C6-7; (2) lumbar spine- degenerative disc disease at T12-L1, L1-2, L5-S1; (3) focal segmental glomerulosclerois; (4) Crohn's Disease; and (5) knees: bilateral sprain and MCL tear of the left knee. (SAR 150-154.) In February 2015, the Plan's Disability Initial Claims Committee denied Mr. Dimry's application finding that he was not totally and permanently disabled because (1) the neutral orthopedist found that he was employable, and (2) he had not presented evidence that he received Social Security disability benefits. (SAR 259.)

Mr. Dimry thereafter retained counsel and appealed the Committee's denial to the Retirement Board which is the Plan Administrator.[3] (SAR 64, 275-290.) In November 2015, the Board voted unanimously to deny Mr. Dimry's appeal concluding that he was not totally and permanently disabled within the meaning of Section 5.2(a) of Plan because the Plan's neutral physicians reported, after examination, that Mr. Dimry was capable of employment. (SAR 399-401.) In reaching its decision, the Board noted that there was "potentially conflicting medical evidence" in the record and that "[t]o the extent some of the evidence suggested that you might be totally and permanently disabled, the Retirement Board credited the findings of the Plan's neutral physicians over that evidence" because "[w]hen presented with conflicting medical evidence, the Retirement Board generally has more confidence in the reports of its neutral physicians, who are instructed to evaluate Players fairly, without bias for or against the Player, and who have

---

[3] The Board is made up of six voting members—three are former NFL players appointed by the NFL Players Association and three are League representatives appointed by the NFL Management Council. (SAR 105.) The Commissioner of the NFL is a non-voting member of the Board. (*Id.*)

experience evaluating Players and other professional athletes." (SAR 400.)

In March 2016, Mr. Dimry filed a complaint in this District under ERISA (1) seeking to recover benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); (2) alleging breach of fiduciary duty under ERISA § 404(a), 29 U.S.C. § 1104(a); and (3) seeking statutory penalties under ERISA § 502(c)(1), 29 U.S.C. 1132(c)(1). *See Dimry v. Bert Bell/Pete Rozelle NFL Player Retirement Plan, et al.*, No. 16-1413 JD. Shortly thereafter, the Social Security Administration granted Mr. Dimry's application for disability insurance benefits finding that Mr. Dimry has been disabled since October 1, 2012. (SAR 9.) In 2018, the district court granted judgment in Mr. Dimry's favor finding the Board abused its discretion because the Board's denial of Mr. Dimry's benefits claim was "based upon an unreasonable bias in favor of Plan-selected physicians" and remanded the matter to the Board to re-evaluate Mr. Dimry's T&P benefits claim. *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2018 WL 1258147, at *4 (N.D. Cal. Mar. 12, 2018) ("*Dimry I*").

On remand, Sam Vincent, the Disability Plan Manager, asked the Plan's Medical Director Dr. Allen Jackson to "provide a complete review" of Mr. Dimry's application and the neutral physician reports, and provide a written report. (SAR 18.) Dr. Jackson thereafter prepared an eight-page report which concluded:

> So while Mr. Dimry undoubtedly has some continuing symptoms that would be supported by his known abnormalities of this cervical spine from his previous fusion surgeries, his primary impairment appears to be pain and subjective complaints that are not quantifiable and not supported by any objective neurologic abnormalities by multiple examiners. If total and permanent disability determinations have to be supported by objective findings which would support his subjective complaints, then it is my opinion that the medical records reviewed do not provide significant objective support for this determination of total and permanent disability.

(SAR 26.) The Board considered Dr. Jackson's report at their May 15-16, 2018 Board meeting and tabled Mr. Dimry's application "for further review and clarification by [Dr. Jackson]." (SAR 32.) The Board then sent Dr. Jackson a letter with 10 categories of follow-up questions. (SAR 36-37.) Dr. Jackson provided a written response to the Board's questions which concluded that Mr. Dimry's minor degenerative disc disease did not preclude him "from working in a light or

3

1    sedentary job." (SAR 38-42.) On August 22, 2018, the Board considered Mr. Dimry's application
2    again and voted unanimously to again deny his T&P benefits application. (SAR 43-52.) This
3    second lawsuit against the Plan and the Board wherein Mr. Dimry seeks to recover benefits under
4    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) followed.

## DISCUSSION

**A. Standard of Review**

A plan participant may sue under ERISA "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan..." 29 U.S.C. § 1132(a)(1)(B). "A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit Plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan" in which case an abuse of discretion standard of review applies. *Firestone Tire and Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989). Here, it is undisputed that the Plan gives the Board "full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan and the Trust" including to "[d]ecide claims for benefits" and thus an abuse of discretion standard applies.  (SAR 105-106.)

Mr. Dimry insists that the Court's abuse of discretion review must be tempered with skepticism given an inherent conflict of interest. *See Harlick v. Blue Shield of California*, 686 F.3d 699, 707 (9th Cir. 2012) ("our review is tempered by skepticism when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits") (internal citation and quotation marks omitted); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) (finding that in applying the abuse of discretion standard, courts should consider any conflict of interest of the plan administrator). The most common type of a conflict is a structural conflict which arises "where, as here, the same entity makes the coverage decisions and pays for the benefits." *Harlick,* 686 F.3d at 707. The Court has already concluded that there is no structural conflict here because the Plan is a multi-employer benefit trust fund maintained under the Taft–Hartley Act. (Dkt. No. 32 at 2.)

Mr. Dimry does not seek to revisit the Court's prior decision, but instead maintains that

4

there is a conflict of interest given the Plan-retained physicians' financial conflict of interest. Even absent a structural conflict, "reliance on the reports of [] retained experts who have a financial incentive to make findings favorable to [the Board] may warrant skepticism." *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 902 (9th Cir. 2016). As the *Dimry I* court explained:

> Our circuit has held that the reliance of a benefits plan "on the reports of its retained experts who have a financial incentive to make findings favorable" to the plan "may warrant skepticism," even in the absence of a structural conflict. The concern is that a doctor who reaps substantial income or business benefits from plan referrals might allow economic self-interest to influence medical opinions and judgments about a claimant's disabilities. This is not to say that referral physicians are per se biased against claimants any more than treating physicians are per se biased in favor of their patients. The party claiming a conflict bears the burden of producing "evidence of a financial conflict sufficient to warrant a degree of skepticism." If that showing is successful, the burden shifts to the plan to counter it.

*Dimry I*, 2018 WL 1258147 at *3 (citing *Demer*, 835 F.3d at 902). The *Dimry I* court held that evidence that the Plan had paid Dr. Meier, the orthopedist it first retained to opine on Mr. Dimry's application, approximately $190,000 during the one year period when he examined Mr. Dimry satisfied Mr. Dimry's initial burden of production as the amount exceeded the amount of concern in *Demer*. The burden thus shifted to the Plan to counter that initial showing, and *Dimry I* held that the Plan had not satisfied its burden; therefore, a "modicum of skepticism" was added to the standard of review. *Dimry I*, 2018 WL 1258147 at *4.

This time around Mr. Dimry offers evidence that the Plan paid Dr. Meier $213,348 to conduct 67 medical examinations in 2014 (the year he conducted his exam of Mr. Dimry). (Dkt. No. 36-5 at 3.) Likewise, the Plan paid Dr. Chen, who examined Mr. Dimry at the Board's request following receipt of his appeal, $71,450 in 2015 (the year he examined Mr. Dimry) which includes $48,000 to conduct 16 medical examinations. (*Id.*) Further, Dr. Jackson, whose supplemental reports the Board relied upon in denying Mr. Dimry's benefits application following remand, is the Plan's medical director to whom the Plan paid $223,000 for Plan year 2018, including $192,000 for serving as medical director and $5000 in meeting honorariums. (*Id.*) Even apart from any issue preclusion that may apply given the *Dimry I* court's findings, under *Demer* "[t]he magnitudes of these numbers, particularly when combined, raise a fair inference that there is

1    a financial conflict which influenced the [the physicians'] assessments." *Demer*, 835 F.3d at 902.

2    If *Demer* applies, then the burden shifts to the Plan to rebut the showing of financial
3    conflict. As the Court previously noted, however, "[t]here is an argument that *Demer* is
4    distinguishable because it involved a structural conflict that had been mitigated whereas here there
5    is no structural conflict as it is a Taft-Hartley plan." (Dkt. No. 32 at 4.) Although left unsaid,
6    what *Demer* suggests is that the neutral physicians have a financial interest in being retained by
7    the claims administrator in the future, and that because the claims administrator is retained by
8    MetLife—which has a financial interest in paying as few claims as possible—the physicians might
9    believe that an opinion in favor of no disability would make the claims administrator more likely
10   to retain them in the future. In other words, although MetLife mitigated its structural conflict,
11   there was a structural conflict in the first instance of which the independent physicians would be
12   aware. Here, in contrast, the Plan does not have a structural conflict that needed to be mitigated as
13   the Board consists equally of player representatives and NFL representatives. Therefore, although
14   given the frequency and amount of compensation the Plan-retained physicians had a financial
15   interest in continuing to be retained by the Plan, it is difficult to discern why the physicians might
16   infer that an opinion in favor of no disability would be more likely to lead to future retention. It is
17   thus unsurprising that Mr. Dimry has not cited any case other than *Dimry I* that extends *Demer* to
18   a multi-employer benefit trust fund maintained under the Taft-Hartley Act.

19   Accordingly, the Court concludes that a straight-forward abuse-of-discretion standard
20   applies.

21   **B. Abuse of Discretion Review**

22   A plan administrator abuses its discretion if the decision is "(1) illogical, (2) implausible,
23   or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa v.*
24   *Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (*quoting United States v.*
25   *Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). The court weighs factors such as "'the
26   quality and quantity of the medical evidence,' whether the plan administrator relied on an in-
27   person evaluation or conducted a purely paper review of the records, and "whether the
28   administrator considered a contrary [Social Security Administration] disability determination.'"

6

*Gorbacheva v. Abbott Labs. Extended Disability Plan*, 794 F. App'x 590, 593 (9th Cir. 2019) (quoting *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009) (alterations in original)).

Mr. Dimry contends that the Board abused its discretion in denying his benefits claim because (1) he was excluded from the remand process; (2) the denial was based on incomplete, inaccurate, and inconsistent reports from the Plan physicians; (3) the Board's insistence on "objective evidence" is not supported by the Plan; (4) the Board failed to consider Mr. Dimry's Social Security award; and (5) the Board failed to consider or obtain a vocational evaluation.

### 1) Exclusion from the Remand Process

Mr. Dimry complains that he was excluded from the Board's review of his claim following remand in violation of the requirement that there be "a meaningful dialogue between ERISA plan administrators and their beneficiaries," *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997), and that the Plan give a "full and fair review" to an appeal of an adverse benefits determination. *See* 29 U.S.C. §1133(2); 29 C.F.R. § 2560.503-1(h)(1); *Salomaa*, 642 F.3d at 679. A full and fair review requires, among other things, an opportunity for the claimant "to submit written comments, documents, records, and other information relating to the claim for benefits," 29 C.F.R. § 2560.503-1(h)(1)(ii); providing the claimant with reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits, *id.* § 2560.503-1(h)(1)(iii); and taking "into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." § 2560.503-1(h)(1)(iv). For plans providing disability benefits, such as the one at issue here, a full and fair review also requires that before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan must provide the claimant "with any new or additional evidence considered, relied upon, or generated by the plan . . . in connection with the claim; such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided . . . to give the claimant a reasonable opportunity to respond prior to that date." 29 C.F.R. § 2560.503-1(h)(4)(i); *see also*

*Salomaa*, 642 F.3d at 680 (holding that "physician's evaluation provided to the plan administrator falls squarely within [the regulation's] disclosure requirement"); *Schwarz v. Hartford Life & Accident Ins. Co.*, 443 F. Supp. 3d 1085, 1090 (N.D. Cal. 2020) ("29 C.F.R. § 2560.503-1(h)(4) explicitly mandates that administrators send relied-upon evidence to 'the claimant'").

The Board did not fully and fairly review Mr. Dimry's appeal of its adverse benefits decision following *Dimry I*. The Board does not dispute Mr. Dimry's statement that the first communication the Board had with Mr. Dimry following the entry of judgment in *Dimry I* was its letter denying Mr. Dimry's appeal. (Dkt. No. 38 at 7:21-22; SAR 44.) Nor does it dispute Mr. Dimry's argument that the Board did not advise him that it had asked Dr. Jackson to review the appeal, or that it had received a report from Dr. Jackson, or that following that report it sent Dr Jackson a list of questions, or that in response to those questions Dr. Jackson issued a second report. By conducting its second review of Mr. Dimry's appeal in secret, the Board deprived Mr. Dimry of the opportunity to respond to the new evidence upon which the Board relied and perhaps provide evidence of his own—an opportunity required by ERISA's regulations.

In *Salomaa*, for example, the court held that the plan's review of the adverse benefits decision was not fair because the plan did not give the plaintiff and his attorneys and physicians "access to the two medical reports of its own physicians upon which it relied." 642 F.3d at 679. The same is true here. Not only did the Board not give Mr. Dimry access to Dr. Jackson's reports, it did not even let Mr. Dimry know that it was consulting with Dr. Jackson and that he was issuing reports upon which it intended to rely.[4] *See also Schwarz*, 443 F. Supp. 3d at 1090 (concluding

---

[4] Mr. Dimry also argues, and the Board again does not dispute, that in his April 2018 report, Dr. Jackson claimed to have reviewed documents which (1) were not part of the list of documents that the Board asked him to review as part of his re-evaluation, and (2) are not contained elsewhere in the administrative record. (*Compare* SAR 19-20 (listing documents Dr. Jackson should review: December 10, 2014 application, Dr. Meier's February 3, 2015 report, Dr. Chen's October 14, 2015 report, medical records received December 10, 2014, appeal records received August 4, 2015, a September 15, 2015 workers compensation document, and his October 17, 2016 social security filing) *with* SAR 18 (listing documents reviewed including October 2008 Line of Duty Disability application, a September 2008 report from NFL physician Dr. James Tasto, a July 6, 2011 total and permanent disability application, an August 8, 2011 report from NFL physician Dr. Gregory Mack, and an undated report from Rancho Los Amigos National Rehabilitation Center).) Even if some of the documents identified by Dr. Jackson were included in the medical records received

that defendant "failed to substantially comply with ERISA's procedural obligations" when it failed to provide the claimant with the physician file reviews and that because "she did not see Hartford's two file reviews until after the final denial, Ms. Schwarz (and her legal counsel) never had the chance to evaluate or rebut the file reviews' contentions.").

The Board's insistence that Mr. Dimry is at fault because he did not request copies of documents following *Dimry I* is unpersuasive. ERISA regulations unequivocally demand that a full and fair process require the plan to provide the claimant with any new evidence which, upon review, the plan will be relying upon, and to give the claimant an opportunity to respond to that evidence before the plan fiduciary rules on the appeal. 29 C.F.R. § 2560.503-1(h)(4)(i). No language in that regulation requires the claimant to first request that he be provided with a copy of that new evidence; indeed, such a request would be nonsensical where, as here, the claimant had retained an attorney and just won a federal court judgment reversing the appeal denial. That the Board was reviewing Mr. Dimry's appeal following *Dimry I's* remand rather than for the first time is of no moment. The first review was reversed as an abuse of discretion; thus, the full and fair review requirement applied equally if not more so on remand. There is no justification for the Board's decision to exclude Mr. Dimry from the renewed review of his appeal—especially given that the Board's decision was based on a plethora of new evidence—in violation the rule that there be "a meaningful dialogue between ERISA plan administrators and their beneficiaries." *Booton*, 110 F.3d at 1463.

Finally, at oral argument Defendants suggested that even if the Board had allowed Mr. Dimry to participate in the review process, the parties would still be back in court; in other words, Defendants make, in effect, a harmless error argument. (Dkt. No. 44 at 11:9-10.) But the Board's failure to allow Mr. Dimry the opportunity to respond to the new evidence would only be harmless if the Board was not willing to consider whatever new evidence or response Mr. Dimry, his

---

December 10, 2014 or the appeal records received August 4, 2015 which were referenced in the Board's request for re-evaluation, it does not appear that these documents are part of the administrative record. *See Salomaa*, 642 F.3d at 679 (holding that review is not "fair" if claimant and his attorneys did not have access to all of the documents on which the plan relied).

attorney, or his physicians had to the Board's new evidence and reasoning. Such unwillingness is by definition not a full and fair review.

### 2) The Objective Evidence Requirement

Mr. Dimry also takes issue with the Board's reliance on a lack of objective medical evidence supporting the severity of Mr. Dimry's pain complaints to justify its denial of benefits. The Board found that Mr. Dimry was not disabled within the Plan's meaning because the objective medical evidence did not "corroborate" his claim of neck and back pain that was "so disabling that it precluded [him] from employment in any occupation." (SAR 49.) But in his initial report, Dr. Jackson hedged his opinion as to the disability determination: "*[i]f* total and permanent disability determinations have to be supported by objective findings which support his subjective complaints, *then* it is my opinion that the medical records reviewed do not provide significant objective support for this determination of total and permanent disability." (SAR 26 (emphasis added).) Further, in his follow-up report, Dr. Jackson noted that "*[t]he pain associated with degenerative disc disease is not predictable nor is it quantifiable*; however, it is now a degenerative disc disease and does cause some spinal pain. *The pain is not always predictable and/or directly correlates with the severity of the degenerative change*." (SAR 41 (emphasis added).)

Despite Dr. Jackson having advised the Board that objective evidence would not necessarily exist to corroborate Mr. Dimry's claimed pain as such "pain is not always predictable and/or directly correlates with the severity of the degenerative change," the Board denied Mr. Dimry's benefits' claim because the objective evidence did not support his pain complaints. (SAR 49 (denial letter noting that Mr. Dimry's "pain is completely subjective and inherently unquantifiable" and required the "available evidence [to] corroborate[] [your] complaints.").) Indeed, despite Dr. Jackson's conclusion that pain from degenerative disc is not quantifiable or predictable, the Board concluded that it would expect to see "major degenerative disc disease, degenerative facet joint disease" and other objective findings. (SAR 49.)

The Board's requirement that Mr. Dimry produce objective evidence to support his pain complaints was "illogical" and "without support in inferences that may be drawn from the facts in

10

the record." *Salomaa*, 642 F.3d at 676.

First, it is undisputed that the Plan did not limit benefits to claimants who can produce objective evidence supporting subjective complaints of pain. *See Moody v. Liberty Life Assur. Co. of Bos.*, 595 F. Supp. 2d 1090, 1098 (N.D. Cal. 2009) (holding that a plan "cannot exclude a claim for lack of objective medical evidence unless the objective medical evidence standard was made clear, plain and conspicuous enough in the policy to negate layman plaintiff's objectively reasonable expectations of coverage") (internal quotation marks and citation omitted).

Second, while a plan may consider the lack of objective medical evidence in making a benefits determination, "reliance on objective evidence can be problematic for medical conditions that are not amenable to objective verification." *Id*. at 1099.  Dr. Jackson opined that Mr. Dimry was not disabled *if* his subjective pain complaints had to be supported by the objective medical evidence. And he also opined, in effect, that Mr. Dimry's pain complaints could be accurate despite not being fully supported by the objective medical evidence given the nature of his impairment.  The Board made no attempt to follow up with this observation. For example, in its follow up questions to Dr. Jackson following his initial report, the Board did not ask him "whether" objective evidence is required.  (SAR 36-37.)   Instead, in contravention to Dr. Jackson's opinion, the Board essentially concluded that Mr. Dimry was not disabled based on his "failure to produce evidence that [might] simply not [be] available." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 n.3 (9th Cir. 2008) (noting that "Social Security precedents are relevant for the factual observation that disabling pain cannot always be measured objectively—which is as true for ERISA beneficiaries as it is for Social Security claimants" and "that individual reactions to pain are subjective and not easily determined by reference to objective measurements."); *see also Montour*, 588 F.3d at 635 ("it would probably have been unreasonable for Hartford to require Montour to produce objective proof of his pain level); *Minton v. Deloitte & Touche USA LLP Plan*, 631 F. Supp. 2d 1213, 1220 (N.D. Cal. 2009) ("by effectively requiring objective evidence for a disease that eludes such measurement, MetLife has established a threshold that can never be met by claimants who suffer from fibromyalgia or similar syndromes, no matter how disabling the pain.") (internal citation and quotation marks omitted).  The record

11

thus does not support the Board's determination that without objective medical evidence Mr. Dimry's pain cannot be as debilitating as he and his physicians report.

### 3) The Social Security Award

The Board initially denied Mr. Dimry's appeal because, among other things, the Social Security Administration had not awarded him disability benefits. While *Dimry I* was pending, the Social Security Administration approved his application for disability benefits. (SAR 9-17.) Significantly, the Administrative Law Judge ("ALJ") specifically found that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms and that his statements concerning the intensity, persistence and limiting effects of these symptoms are reasonably consistent with the medical evidence and other evidence in the record.
>
> **Indeed, the medical evidence fully supports the claimant's allegations and documents his ongoing difficulties, particularly in regard to his neck.**

(SAR 13 (emphasis added).) In other words, the ALJ found that Mr. Dimry's impairments *could be reasonably expected* to cause his debilitating pain.

Following the *Dimry I* remand, the Board requested that Dr. Jackson consider the Social Security Administration's decision, and he did so, but he did not appear to give any weight to the ALJ's finding and there is nothing in the record that suggests he asked for any review of the social security record. (SAR 18, 26.) The Board, in its renewed denial, concluded that the Social Security Administration's grant of benefits "did not alter its independent conclusion that the evidence surrounding [Mr. Dimry's] December 2014 application did not show that [he] was totally and permanently disabled under the terms of the Plan." (SAR 50.)

Mr. Dimry insists that the Board abused its discretion when it failed to acknowledge—let alone reconcile—its grant of Mr. Dimry with "Inactive B" benefits following his social security award with its finding that Mr. Dimry was not disabled. The Plan has two different approaches for handling a player's receipt of a favorable social security award. First, if the player's application for social security benefits is approved prior to applying for Plan benefits, then under Section 5.2(b) of the Plan, at the time the player applies for Plan benefits he is deemed totally and

permanently disabled (unless four voting members of the Board determine that the player was fraudulently receiving the social security benefits). (SAR 53-54.) Second, if a player receives a favorable social security award while his application for Plan benefits is pending—as with Mr. Dimry—then, under Section 5.8 of the Plan (assuming certain factors not at issue here) the player is automatically awarded Inactive B T&P benefits. (SAR 55.) In other words, if Mr. Dimry had waited to apply for Plan benefits until *after* his favorable social security award he would have automatically been deemed permanently disabled. Mr. Dimry does not challenge these Plan provisions or argue that he should be entitled to benefits under Section 5.2(b), but he does highlight the arbitrariness of the Board's decision here to wholly disregard a decision from the Social Security Administration which but for the timing of the decision would have necessitated a finding that he was disabled under the Plan.

The arbitrariness of the Board's decision is further underscored by the reasons it advanced for disregarding the Social Security Administration's decision and its failure to provide an explanation for why it concluded that the medical evidence did not support Mr. Dimry's pain complaints even though the ALJ found that it did. *See Montour*, 588 F.3d at 635 ("While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process.") (internal citation and quotation marks omitted).

First, the Board explained that the Social Security Administration did not have the benefit of Dr. Meier's and Dr. Chen's reports explaining that "the record before the Social Security Administration was devoid of conclusions—which were formed after an independent review of your records and a full, physical evaluation." (SAR 51.) However, neither Dr. Jackson nor the Board considered the full social security record, including all the objective evidence on which the ALJ relied. Thus, the Board discounted the ALJ's opinion because it did not have the benefit of Dr. Meier's and Dr. Chen's reports, while simultaneously ignoring the medical evidence which the ALJ relied upon when he concluded that the objective evidence supported a disability finding. In *Moody*, the defendant only considered one of the physician reports prepared in the context of

13

plaintiff's social security application and declined to consider the rest because it already had its own physician reviews. *See Moody*, 595 F. Supp. 2d at 1100. The court found that in doing so defendant acted as an adversary, not a fiduciary. *Id*. at 1100-01. So too here. The Board's rejection of the ALJ's findings is particularly striking where, as here, the Board's non-disability finding was based on the absence of objective evidence, and the ALJ discussed the objective evidence in Mr. Dimry's Social Security file at length—none of which Dr. Jackson reviewed. (SAR 12-13.)

Second, the Board noted that Mr. Dimry's social security application had been denied twice before it was granted by the ALJ. (SAR 51.) Defendants contend that these denials are evidence that reasonable minds could differ as to whether Mr. Dimry is disabled which precludes a finding that the Board's decision that he was not disabled was arbitrary. Not so. The issue is that the ALJ found that the medical evidence supported Mr. Dimry's pain complaints while the Plan physicians did not. While the Board was not required to accept the ALJ's opinion, it had to consider it and explain why it was not persuasive. That the Social Security Administration had found earlier on a different record that Mr. Dimry was not disabled is not a rational reason for not even considering the ALJ's opinion. Defendants' reliance on *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, in this regard is misplaced. 370 F.3d 869 (9th Cir. 2004), abrogated on other grounds by *Salomaa*, 642 F.3d at 673-74. *Jordan* noted how "[p]hysicians have various criteria, some objective, some not, for evaluating how severe pain is and whether it is so severe as to be disabling." *Id.* at 880. When the claims administrator had reports from plan physicians whose evaluations of those criteria differed from the treating physicians and were also more thorough and less conclusive, then the fiduciary did not abuse its discretion in adopting the opinion of the plan physicians. *Id.* Here, in contrast, the Board required objective evidence—and asked Dr. Jackson only about the objective evidence—excluding any non-objective evidence from the evaluation. Thus, it was not reasonable to reject the ALJ's opinion out of hand simply because it conflicted with Dr. Jackson conditional opinion. (SAR 26 ("*If* total and permanent disability determinations have to be supported by objective findings which support his subjective complaints, then it is my opinion that the medical records reviewed do not provide significant

14

support for this determination of total and permanent disability.") (emphasis added).)

Third, the Board claimed that "[t]he Social Security decision turned on factors that are irrelevant to a finding of total and permanent disability under the Plan, such as your education and work experience." (SAR 51.) In so finding, the Board ignored that even without the vocational expert's opinion, the ALJ found that Mr. Dimry was limited to sedentary work such that he could only stand for 15 minutes at a time and sit for 15 minutes at a time, that he can only sit, stand, and walk a total of 2 hours in an 8-hour day, and that he would miss approximately 4 days of work a month. (SAR 12.) In reaching this conclusion, the ALJ considered neither Mr. Dimry's education nor his work experience. Education and work experience also have nothing to do whether the medical evidence fully supported Mr. Dimry's pain complaints, as the ALJ found.

Finally, the Board found that it, unlike the Social Security Administration, was not required to give substantial weight to the opinions of Mr. Dimry's treating physicians and the opinions of his treating physicians were not entitled to "much weight, much less dispositive weight." (SAR 50.) Defendants are correct that the Board is not bound by the Social Security Administration's treating physician rule. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The Board, however, may not simply discount the ALJ's finding out of hand.

Thus, while the Board offered reasons for failing to credit Mr. Dimry's Social Security award, its reasons for doing so were not "the result of a principled reasoning process." *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006), aff'd sub nom. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Rather, its decision appears to have been ends driven rather than driven by a desire to have a full and fair review of the record on which to reach its decision.

\*\*\*

The Board's glaring procedural error of conducting its review of Mr. Dimry's appeal in secret and then, after denying his appeal, refusing even then to engage in a meaningful dialogue and instead telling Mr. Dimry to file a lawsuit is reason alone to find that the Board abused its discretion. *See Salomaa*, 642 F.3d at 676. Further, this error was not harmless. Providing Mr. Dimry, his attorney, and physicians the opportunity to participate in the appeal and comment on the new evidence might have persuaded the Board to revisit its unreasoned decision to require

15

objective medical evidence given that its own medical director opined that for Mr. Dimry's impairments the objective medical evidence would not be expected to always corroborate with legitimate pain complaints. A meaningful dialogue could have led to the Board actually grappling with the ALJ's finding that the medical evidence "fully supported" Mr. Dimry's allegations. Instead, once again, the Board seemed intent on simply following the conclusions of its initially-retained physicians, *see Dimry I*, 2018 WL 1258147, at *4, and thus, once again, abused its discretion.

### 4) Remedy

Having concluded that the Board abused its discretion, the Court must determine the appropriate remedy. In the Ninth Circuit, if a decision to deny benefits is found unreasonable, then a "court can either remand the case to the [plan] administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Demer*, 835 F.3d at 907 (internal citation and quotation marks omitted). However, "an award of benefits is not a proper remedy [where] the record does not clearly establish that [the plan administrator] should necessarily have awarded [the plaintiff] benefits." *Id.*; *see also Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001) (stating that "retroactive reinstatement of benefits is appropriate in ERISA cases where, ... but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits or where 'there [was] no evidence in the record to support a termination or denial of benefits'[;] [i]n other words, a plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts") (internal citation and quotation marks omitted; alterations in original); *Canseco v. Constr. Laborers Pension Tr. for S. Cal.*, 93 F.3d 600, 609 (9th Cir. 1996) (stating that, "[u]nlike cases wherein we have remanded to the plan administrator, no factual determinations remain to be made in this case").

Given the Court's findings above, remand is the appropriate remedy. The Court expects that once the Board gives Mr. Dimry the full and fair review ERISA requires, and eliminates the mandate of objective evidence—a mandate not in the Plan and not in Dr. Jackson's reports— that Mr. Dimry will be found disabled under the Plan. But the Court cannot say this in the first

instance as the Board did not ask Dr. Jackson—on whose opinion it exclusively relied in denying Mr. Dimry's claim on remand—whether given his subjective reports of pain, if objective evidence was *not* required, Mr. Dimry had a total and permanent disability.[5]  *See Gross v. Sun Life Assurance Co*., 763 F.3d 73, 76 (1st Cir. 2014) (stating that where an administrative record is "inadequate to allow a full and fair assessment of [a plaintiff's] entitlement to disability benefits, a remand "to allow further development of the evidence" is appropriate) (internal citation and quotation marks omitted).

## CONCLUSION

For the reasons stated above, the Court GRANTS Mr. Dimry's motion for judgment and DENIES Defendants' motion for judgment. The matter is REMANDED to the Board for further proceedings consistent with this Order. On remand, the Board is reminded of its obligation to provide Mr. Dimry a full and fair opportunity to participate in the process.

Separate judgment will be entered in Mr. Dimry's favor.

This Order disposes of Docket Nos. 33 and 36.

**IT IS SO ORDERED.**

Dated: September 15, 2020

*[signature]*

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

---

[5] The Court has considered Mr. Dimry's arguments regarding the errors in Dr. Meier's and Dr. Chen's reports and finds that even if the Court accepted these arguments, it could not award benefits because the errors Mr. Dimry identifies in their opinions do not resolve the objective versus subjective evidence question.

17